### INSURANCE AGAINST OCCUPATIONAL DISEASES.

Court of Appeals for Hamilton County.

THE INDUSTRIAL COMMISSION OF OHIO AND WALLACE D. YAPLE ET AL V. DAVID BROWN.[*]

Decided, January 23, 1915.

_Workmen's Compensation Act—Word "Injuries" Includes Occupational Diseases—Protection to Employees Against Disease or Harm to Health._

The language employed in the workmen's compensation act is sufficiently broad to include occupational diseases, and inasmuch as the disease sometimes contracted by industrial workers, due to the nature of their employment, are of a grave character, and are known to have been under consideration by the Legislature which enacted the law, it must be concluded that it was the intention such diseases should be included in the provisions for disabled workmen.

_Timothy S. Hogan_, Attorney-General, _Jas. L. Boulger_, Assistant, _Thomas L. Pogue_, Prosecuting Attorney, and _John V. Campbell_ and _Carl M. Jacobs_, Assistants, for plaintiffs in error. _Kelley, Huseman & Remke_, contra.

---

[*]Affirming _Plasco_ v. _American Carriage Co._, 15 N.P.(N.S.), 273, and _Brown_ v. _Industrial Commission_, 16 N.P.(N.S.), 160.

JONES (OLIVER B.), J.; JONES (E. H.), J., concurs; SWING, P. J., dissents.

.The question to be determined in this case is whether the "injuries" provided for in the workmen's compensation act of Ohio includes occupational diseases contracted in the course of employment.

The original workmen's compensation act is entitled "An act to create a state insurance fund for the benefit of injured, and the dependents of killed employees, and to provide for the administration of such fund by a state liability board of awards." It was passed and approved by the Governor, June 15, 1911, and is found in 102 Ohio Laws, 524, including Sections 1465-37 to 1465-79 of the General Code. This law made the creation of the state insurance fund voluntary with both the employers and the employees. It was amended by the act passed in 1913, filed in the office of the Secretary of State March 17, 1913, and is found in 103 Ohio laws, 72, amending certain sections of the original law and adding thereto, including Sections 1465-42 and 1465-106. This made the law compulsory for all employers employing five or more workmen or operatives, and included also persons in the service of the state, counties, municipalties or school districts.

Intervening between the two laws the Constitution of Ohio was amended by the people at the election held September 3, 1912, by providing Section 35, Article II, which authorized legislation to provide for compulsory workmen's compensation.

It is proper to consider this constitutional amendment and these acts together in the determination of the legislative intent; and it is also allowable to consider the legislative history of the statute as an important element in construing it, where any ambiguity is found. *Lewis' Sutherland Statutory Construction,* Section 470, p. 879; *McLean* v. *U. S.,* 226 U. S., 375, 380; *R. R. Co.* v. *Washington,* 222 U. S., 370, 380; *Oceanic Steam Nav. Co.* v. *Stranahan,* 214 U. S., 320, 333.

Under the act passed May 10, 1910 (101 Ohio Laws, 231), a commission was appointed consisting of "five electors of the state known to possess knowledge and training in the subject of

employers' liability laws and compensation of employees for injuries received in the course of employment * * * to make an inquiry, examination and investigation into the subject of a direct compensation law or a law affecting the liability of employers to employees for industrial accidents."

This commission made a full, detailed report to the Legislature, which has been printed, and which has collected a great mass of evidence and facts, and interesting matter in relation to the subject. On page lviii Mr. Emile E. Watson, director of investigation, in connection with this work, used the following language in regard to occupational diseases:

"It is difficult to make any clear distinction between industrial accidents and occupational diseases. Often the latter are responsible for the former."

Many plans were discussed by the commission, and the draft of a bill was submitted. The act, however, as finally passed was not identical with that recommended. Among the other recommendations made by the commission is the one found on page lxii containing the following language:

"Mr. E. E. Watson, the investigator in chief of the commission, has called our attention in his report on the fatal accidents in Cuyahoga county, Ohio, *to the great need of investigation of occupational diseases which undermine the health of working men and put the state to great expense in maintaining hospitals and caring for the little ones.*

"Inasmuch as European countries recognize occupational diseases as an important factor in their industrial problem, and many of our own industries develop the same without any systematic provision for their care and prevention.

"*The commission recommends that the General Assembly take such action as is most wise to correct the dangerous conditions which have long existed and which injure the health and safety of industrial workers of this state.*"

It is argued that because joint resolutions of the General Assembly were adopted in 1911 and 1913, authorizing and directing the state board of health to make an investigation of occupational diseases, which resolutions are found in 102 O. L., 749, and 103 O. L., 975, therefore it might be concluded that no legislation

had yet been had upon the subject. There is, however, an act for the prevention of occupational diseases with special reference to lead poisoning, passed April 18, 1913, found in 103 O. L., 819. This act, however, is for the prevention of occupational diseases and not for the payment of compensation to the victims thereof. It must be understood that these matters of prevention and compensation are two entirely distinct subjects, and may be legislated for by entirely distinct and separate laws.

Section 35, Article II of the Constitution as amended, is in the following language:

"For the purpose of providing compensation to workmen and their dependents, for death, injuries or occupational disease, occasioned in the course of such workmen's employment, laws may be passed establishing a state fund to be created by compulsory contribution thereto by employers, and administered by the state, determining the terms and conditions upon which payment shall be made therefrom, and taking away any and all rights of action or defenses from employees and employers; but no right of action shall be taken away from any employee when the injury, disease or death arises from failure of the employer to comply with any lawful requirement for the protection of the lives, health and safety of the employees. Laws may be passed establishing a board which may be empowered to classify all occupations, according to their degree of hazard, to fix rates of contribution to such fund according to such classification, and to collect, administer and distribute such fund, and to determine all rights of claimants thereto."

It is argued that the words in this section provide for at least two separate classes: "injuries," which plaintiffs in error contend means accidental injuries, and "occupational diseases," which is entirely distinct. It might as well be argued that compensation for death must likewise be entirely separate. The words used "providing compensation * * * for death, injuries or occupational diseases occasioned in the course of such workmen's employment" do not necessarily mean separate provisions. An injury, whether resulting from an accident or from disease, may result in death, so that the term "death" would cover both. The word "injury" in its etymological signification is sufficiently broad and inclusive to cover both an accidental in-

jury and also an injury because of an occupational disease, and the use of the disjunctive ''or'' indicates that the two are in the alternative or used in an explanatory sense rather than that they are used as constituting two distinct classes. And this argument is strengthened by the further wording of the clause, as provision is made for ''laws establishing *a state fund,*'' not two distinct funds, but a single ''state fund.'' And the section further provides for the passage of laws establishing a board, not a board for accidental injuries and another board for occupational diseases, but one board ''to classify all occupations according to their degree of hazard.'' This language provides for the hazard of accident as well as the hazard of occupational disease; ''to fix rates of contribution to such fund'' (still providing for a single fund) ''and to collect, administer and distribute such fund, and to determine all rights of claimants thereto.'' While the language used in this section does not absolutely preclude the separation of these subjects into two matters of legislation providing for two or more boards and two or more funds, yet it indicates that the whole subject, including all of the evils provided for, should be legislated for by the creation of a single board and a single fund to cover compensation for all ''injuries.''

The argument is made that the use of the word ''killed'' in the title of the original act carries with it an indication that it means killed *by accident.* The definition given by Funk & Wagnall's Standard Dictionary of the verb ''Kill'' is: ''to put an end to the animal existence of; put to death, as a human being.'' And in a discussion of the synonyms of the word, it is stated: ''to kill, is simply to deprive of life, human, animal or vegetable, with no suggestion of how or why.'' In the ordinary use of language it certainly is as proper to say that a man is killed by one of a number of repulsive and deadly so-called ''occupational diseases'' as by accident.

The word ''injury'' is defined by the Century Dictionary as ''harm inflicted or suffered; mischief; damage; hurt.'' It is defined by Judge Shelton of the Supreme Court of Massachusetts *In Re Burns,* 105 N. E., at page 603:

"In common speech the word 'injury' as applied to a personal injury to a human being, includes whatever lesion or change in any part of the system produces harm or pain, or a lessened facility of the natural use of any bodily activity or capability."

There can be no question but that the word is broad enough in its usual and accepted meaning to cover not only an injury by accident, but also an injury caused by an occupational disease such as lead poisoning.

It is hardly necessary to go through the different sections of the two Ohio laws to discuss the words used therein, but a careful examination will show that the word "injury" is used alone and not in connection with the term "accident" or "accidental." In Section 36 (G. C. 1465-75.) of the original act and Section 43 of the later act (G. C. 1465-90) where an appeal is provided for, the word "accident" is used, but it is used only in one of three several clauses which read together do not exclude the case of an occupational disease. It is urged that the word "inflicted" in this connection—"that the injury was self-inflicted"—indicates something too positive and active to apply to a disease. But recourse to the dictionary shows a definition given by the Century of the word "inflict": "to lay on, or impose, as something that must be borne or suffered; caused to be suffered; as to inflict punishment on offenders." The word is unusual in connection with disease, but is equally unusual in connection with an accident, and can undoubtedly be applied to one as well as to the other.

The first act under consideration here was before the Supreme Court in the case of *State, ex rel* v. *Creamer*, 85 O. S., 349. The only question before the court in that case was whether or not the act was constitutional, and it was held by the court to be constitutional. Nothing else was considered by the court. There was no question before it as to the extent of the act, whether it covered occupational diseases as well. Counsel in this case have, however, quoted the language used by Judge Johnson in two places in the opinion. On page 386:

"It provides a plan of compensation for injuries not wilfully self-inflicted, resulting from accidents to employees of employers, both of whom have voluntarily contributed to the fund."

And on page 389, referring to the report of the commission before referred to, the following language:

"Substantially its conclusions are, that the system which has been followed in this country of dealing with accidents in industrial pursuits is wholly unsound."

The matter under discussion by the court in that case, as was stated before, was the legislative power to deal with the matter, and not the extent of the provisions they had made by the law under consideration, and the words used were not intended to limit the operation of the law, but are perfectly consistent with the view we. have adopted.

The difficulties that meet us in considering this question arise largely from the form of the English workmen's compensation act, which was largely used as a guide in framing legislation by several states in this country including our own General Assembly. Under the English law the claimant must have suffered an injury by accident. In *Turvey* v. *Brintons, Ltd.* (1904), 1 K. B., 328, it was held that a workman who had become infected with anthrax, a disease from wool by means of the bacillus from the wool entering his system through the eye, had received an injury by accident and came within the terms of the act. But in *Steel* v. *Cammell, Laird & Co.* (1905), 2 K. B., 232, a workman who had handled white and red lead, and became affected with lead poisoning, was held not to have received an injury within the terms of the act. The act was afterwards amended so as to specifically include certain occupational diseases, among which was lead poisoning, all set out and contained in a schedule. It did not attempt to declare any such occupational disease an accident, but without changing the general terms of the act, provided compensation therefor "as if the disease * * * were a personal injury by accident arising out of and in the course of· that employment."

A number of our states have adopted the English act as the basis of their workmen's compensation laws, and have carried into the terms of the act words requiring the injury to be accidental. This is true in Michigan, where the title of the act, which under the terms of the Michigan law is an essential part

provides "compensation for the accidental injury or death of employees." The Supreme Court of Michigan in the case of *Adams* v. *Acme White Lead & Color Works,* 148 N. W., 485, which is relied upon by counsel for plaintiffs in error, discuss this subject fully, and come to the conclusion because of the terms of the Michigan act, that a case of lead poisoning does not come within its benefits.

The same is true as to the laws of New Jersey, where the term "injury by accident" is used in the law. In *Liondale Bleach, Dye & Paint Works* v. *Riker,* 89 Atl., 929, where the claimant was affected by a rash caused by contact with dampened goods being dyed, it was held that the petitioner was not injured by an accident and was therefore not within the terms of the act.

The Massachusetts law, however, is similar to that of Ohio in providing damages for a personal injury sustained by an employee in the course of his employment. The case of *In re Hurle* 104 N. E., 336, is directly in point. It authorized the payment, under the act, for loss of vision in both eyes, which resulted from an acute attack of optic neuritis caused by coal tar gases. In the opinion, Rugg, C. J., enters into a full discussion of the subject. At the close of his opinion he uses the following language, page 338:

"The difference between the English and Massachusetts acts in the omission of the words 'by accident' from our act, which occur in the English act as characterizing personal injuries, is significant that the element of accident was not intended to be imported into our act. The noxious vapors which caused the bodily harm in this case were the direct production of the employer. The nature of the workman's labor was such that they were bound to be thrust in his face. The resulting injury is direct. If the gas had exploded within the furnace and thrown pieces of cherry hot coal through the holes into the workman's eye, without question he would have been entitled to compensation. Indeed there probably would have been common law liability in such case. There appears to be no sound distinction in principle between such case and gas escaping through the holes and striking him in the face whereby through inhalation the vision is destroyed. The learned counsel for the insurer in his brief has made an exhaustive and ingenious analysis of the entire act touching the words 'injury' or 'injuries' and has

sought to demonstrate that it can not apply to an injury such as that sustained in the case at bar. But the argument is not convincing. It might be decisive if accident had been the statutory word. It is true that in interpreting a statute words should be construed in their ordinary sense. Injury, however, is usually employed as an inclusive word. The fact remains that the word 'injury' and not 'accident' was employed by the Legislature throughout this act. It would not be accurate but lax to treat the act as if it referred merely to accidents.''     .

This case also decides that—

''At common law the occurring of a disease or harm to health . is such a personal injury as to warrant a recovery, if the other elements of liability for tort are present.''

Another recent case decided by the Supreme Court of Massachusetts is directly in point: *Johnson* v. *London Guarantee & Accident Co.,* 104 N. E., 753. The syllabus is as follows:

'' 'Personal injury' within the workmen's compensation act, includes any injury or disease, as lead poisoning, arising out of or in the course of the employment, causing incapacity for work, and thereby impairing ability for earning wages.

''Though prior to, as well as after, the time the workmen's compensation act went into effect, an employee, engaged as a lead grinder, absorbed lead into his system, he received a personal injury, within the act, only when the accumulated effect thereof manifested itself and he became sick therefrom and unable to work.

''The personal injury of a lead grinder, sickness incapacitating him from work, resulting from the accumulated effect of gradual absorption of lead into his system, arises 'out of and in the course of his employment within the workmen's compensation act.' ''

This case fixes the time of the injury as the time that he became sick from such disease and unable to work. This removes an objection made by counsel that the date of the injury would be uncertain, and it must be fixed under certain sections (among others, Sections 25 and 26 of the first act, and 31 and 32 of the second act).

In the opinion of the court, therefore, in the light of its acts and proceedings the Legislature must be deemed to either

have included occupational diseases in the legislation already
had, or to have postponed legislation in regard thereto until fur-
ther light can be had upon the subject. As we have found that
the language employed in the acts under consideration is so
broad in its terms as to include occupational diseases, and as
the matter was under consideration by the Legislature, and the
evils arising from these diseases are of as grave a character and
as worthy of prompt legislation as different forms of industrial
accidents, and are as much entitled to be made a charge upon
the industry in every respect, we can but conclude that it was
the intention that compensation should be provided for such
occupational diseases by the present law. If such conclusion
should be incorrect, the law can be amended so as to clearly
exclude occupational diseases and to confine the compensation
purely to industrial accidents. Even if the language of the
act should be deemed susceptible to either construction, it is
clear that that construction should be accepted which would
provide compensation for those who have contracted occupa-
tional diseases in the course of their employment, rather than
that which would permit them to be without remedy for the
period required to provide such further legislation as might
be deemed necessary to include them beyond all question.

The conclusion of the court therefore is that the court of com-
mon pleas was correct in finding that the plaintiff below is en-
titled to compensation under the act, and the judgment is af-
firmed.